
DA 06-0382

IN THE SUPREME COURT OF THE STATE OF MONTANA

2007 MT 323

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

PENELOPE CELANDINA YOUNG,

      Defendant and Appellant.


APPEAL FROM:    District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DC-04-500
Honorable John W. Larson, Presiding Judge


COUNSEL OF RECORD:

      For Appellant:

          Scott Spencer and Brian K. Yowell, Office of Public Defender, Missoula, Montana

      For Appellee:

          Hon. Mike McGrath, Attorney General; Sheri K. Sprigg, Assistant Attorney General, Helena, Montana

          Fred Van Valkenberg, Missoula County Attorney; Suzy Boylan-Moore Deputy County Attorney, Missoula, Montana


                          Submitted on Briefs:  August 22, 2007

                                Decided:  December 10, 2007


Filed:

_____
                        Clerk


Justice Brian Morris delivered the Opinion of the Court.

¶1 Penelope Young (Young) appeals her conviction in the Fourth Judicial District, Missoula County, for parenting interference in violation of § 45-5-634(1)(a), MCA. She also appeals certain terms and conditions of the sentence imposed by the District Court. We affirm Young's conviction, reverse Young's sentence in part, and remand for further proceedings.

¶2 We review the following issues on appeal:

¶3 *Did the District Court err when it determined that Missoula County was the proper venue for the crime of parenting interference?*

¶4 *Did the State prove the elements of parenting interference?*

¶5 *Did the District Court err in failing to give the jury instructions proposed by Young?*

¶6 *Did the District Court impose an illegal sentence by including conditions regarding alcohol and casinos and by ordering a mental health evaluation?*

¶7 *Did the District Court improperly order restitution?*

**FACTUAL AND PROCEDURAL BACKGROUND**

¶8 Tyler Haugum (Haugum) and Young met in late 2002 in Incline Village, Nevada. The two began dating and the relationship rapidly advanced. Young moved in with Haugum about one month after they met. Young told Haugum in February of 2003 that she had a surprise for him. She handed Haugum a positive pregnancy test. The child's due date was November 9, 2003.

¶9 Young soon exhibited signs of discontent. She informed Haugum that she planned to move to Montana, with him or without him. Haugum closed his business in Nevada and the two traveled to Bozeman in early April of 2003. They rented an apartment in Bozeman for

2

approximately one month. Young then decided she wanted to move to Hamilton. She and Haugum stayed temporarily with Young's mother as the two searched Hamilton for suitable housing.

¶10 The closing of Haugum's business, the pregnancy, and the search for housing apparently created a great deal of stress for the two. Young informed Haugum by the end of May of 2003 that she needed "space." Young asked Haugum to leave for a month.

¶11 Young and Haugum remained in contact, however, over the course of the summer. They spoke on the phone, went camping together, and found a rental house in Hamilton in July of 2003 with the help of Haugum's mother. Haugum and Young lived in the new house for a month. The couple resumed what appeared to be a happy relationship. Haugum accompanied Young to two doctor visits during this period. Young underwent a sonogram on one of these visits. She gave Haugum the sonogram images that revealed a baby girl. Haugum planned a baby shower for Young. Family and friends from all over the country planned to attend the shower.

¶12 Young again expressed a desire for "space." She informed Haugum she had been looking for an apartment. The two discussed the child's future over the few days that Young spent packing her belongings. Haugum insisted that he would be a part of their daughter's life. Young responded, "I know. You're her father." Young called the day after leaving and informed Haugum that she wanted to return. She returned to their house. Young's mother arrived at the house the next morning. Young yet again decided to leave. The couple parted with the understanding that they would remain in contact.

¶13 Young contacted Haugum three weeks later from a Colorado area code. She told Haugum that she was seeing the country and sleeping in her mother's van. Young indicated that the relationship was finished, but agreed that Haugum would attend the birth of the child. Young called in mid-September of 2003 from Hamilton. Young called again two weeks later from Bozeman. She indicated that she had no money and no place to live. Haugum responded that he had money and could reach her in three hours. Young hung up the phone.

¶14 Haugum moved to Missoula in the interim. He began taking parenting classes. He expected Young to contact him before the baby's birth. Haugum slept with his cell phone to ensure he would receive her call. The due date passed. Haugum contacted the Department of Health and Human Services. He eventually learned that Young had given birth in Bozeman. Haugum contacted the Deaconess Hospital in Bozeman to learn the details of the baby's birth. Haugum grabbed some clothes and a recently purchased child safety seat and drove 100 miles per hour to Bozeman. He obtained a phone number for Young. He called that night and left a message expressing his excitement for seeing the new baby.

¶15 Haugum remained in Bozeman for four days without seeing the baby before finally returning to Missoula. He contacted a lawyer about establishing a parenting plan and a determination of paternity. He filed paperwork seeking three weekly temporary "visits" and an overnight "visit."

¶16 Young called Haugum five or six days after the birth of the child. She refused to discuss the baby. The two spoke in person on December 1, 2003. Haugum informed Young that he had filed the paperwork for the parenting plan. He expressed his willingness to pay

4

child support.  Haugum returned to Bozeman a short time later and gave the summons for the proposed parenting and paternity plan to a process server named Linda Sanem (Sanem).  He hired Sanem to locate Young and to serve her with the filing.

¶17    Haugum gave Sanem an apartment number in Bozeman where she might reach Young.  Sanem learned that Young helped manage the apartment complex, including collecting rent and correspondence from tenants.  Sanem attempted to contact Young on December 26, 2003, when she saw Young's car parked outside the complex.  Sanem knocked and rang the doorbell approximately thirty times over the course of fifteen minutes.  A dog barked from inside and the lights came on.  Sanem heard movement, but no one came to the door.

¶18    Sanem returned to the apartment the next day with Young's boss, Debbie Robinson (Robinson), who had a key to Young's apartment.  Robinson knocked on Young's door and let herself into the apartment after receiving no response.  Sanem remained outside.  Robinson spoke with Young and informed her that a person was there to serve her with some paperwork.  Young indicated that the paperwork concerned the custody of the child, and stated that the father of the baby was attempting to have the paperwork served.

¶19    Young told Robinson "I won't be served."  She began pushing Robinson backward out the apartment entrance.  Robinson stated "She's pushing, she's pushing," as she backed out of the door.  From outside Sanem saw only an arm pushing Robinson out the door.  Sanem and Robinson disagreed as to whether Sanem put the papers in the hand that she saw or whether Sanem simply threw them into the apartment.  As she attempted to serve the papers, Sanem stated, "You're served, and you have 20 days to respond to the court in

5

Missoula." The papers found their way into the apartment, but their stay was brief. The papers came flying back out the door seconds later before coming to rest in a snowdrift.

¶20 Haugum contacted the Missoula Police Department on February 2, 2004. Haugum reported that he could not locate Young and the baby. The State charged Young with violation of § 45-5-634(1)(a), MCA, felony parenting interference. The amended information alleged that Young deprived Haugum of parenting rights by "failing to respond to service regarding a parenting plan and disappearing with the child." Young pled not guilty and the case proceeded to jury trial. Haugum testified at trial that he was the father. He also provided testimony regarding the circumstances of the baby's conception, the pregnancy test, the prenatal visits and sonogram images, and the fact that Young stated "You're her father." The jury found Young guilty of parenting interference.

¶21 The pre-sentence report detailed Young's chemical use, family background, and past criminal history. The report revealed that Young had a son with a man named Jason Burlage (Burlage) in 1998. The boy lived with Young until he reached the age of one. Young informed Burlage at that time that he had to take the child or she would put him up for adoption. Burlage received primary custody for their son. The report revealed that Young subsequently took the boy four times without Burlage's approval. On one of these occasions she took the boy to Costa Rica for one month. The State charged Young with parenting interference, but dismissed the charge when she voluntarily returned the child to Burlage.

¶22 Haugum received primary custody of the baby girl before Young's sentencing. The parenting court ordered a mental health evaluation as part of the parenting plan for Haugum and Young. The Court in the separate parenting plan proceeding for Young and Burlage also

6

had ordered Young to undergo a psychological evaluation.  Young failed to comply with either order.

¶23    The District Court sentenced Young to a term of ten years in a women's correctional facility, suspending the sentence with conditions.  The conditions prohibited Young from using alcohol or entering bars and casinos.  The District Court also ordered Young to obtain a mental health evaluation.  The District Court required Young to pay restitution to both Haugum and Burlage for their costs in the separate civil cases.  Young appeals both her conviction and the sentence conditions imposed by the District Court.

## STANDARD OF REVIEW

¶24    The grant or denial of a motion to dismiss in a criminal case is a question of law that we review *de novo* on appeal.  *State v. Price*, 2002 MT 229, ¶ 9, 311 Mont. 439, ¶ 9, 57 P.3d 42, ¶ 9.  We review the sufficiency of the evidence to support a jury verdict of guilty to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, viewing the evidence in the light most favorable to the prosecution.  *State v. Weigand*, 2005 MT 201, ¶ 7, 328 Mont. 198, ¶ 7, 119 P.3d 74, ¶ 7.  We review a district court's decision to give or refuse to give proffered jury instructions for abuse of discretion.  *Bugger v. McGough*, 2006 MT 248, ¶ 20, 334 Mont. 77, ¶ 20, 144 P.3d 802, ¶ 20.  We review a criminal sentence for legality.  *State v. Eaton*, 2004 MT 283, ¶ 11, 323 Mont. 287, ¶ 11, 99 P.3d 661, ¶ 11.

## DISCUSSION

### ISSUE ONE

¶25   *Did the District Court err when it determined that Missoula County was the proper venue for the crime of parenting interference?*

¶26   Young asserts that venue could not lie properly in Missoula County. She notes that neither she nor the baby ever lived in Missoula County. The State contends that the deprivation of parental rights took place in Missoula County because Haugum lived in Missoula.

¶27   The Montana Constitution secures a criminal defendant's right to a trial by jury "of the county or district in which the offense is alleged to have been committed, subject to the right of the state to have a change of venue for any of the causes for which the defendant may obtain the same." Mont. Const. art. II, § 24. Section 46-3-110(1), MCA, provides that the State must file charges in the county where the offense took place unless otherwise provided by law. Montana law allows for the proper filing of charges in more than one county, however, when the requisite acts of a criminal offense occur in multiple counties. *Price*, ¶ 13. The site of a crime depends on the nature of the crime if the offense does not define specifically the place of commission. *Price*, ¶ 20.

¶28   The State charged the defendant in *Price* with custodial interference in Missoula County. *Price*, ¶ 6. Price took his daughter from Missoula and kept her at various locations in Lake County in the midst of marital dissolution proceedings. *Price*, ¶ 4-5. We concluded that the requisite acts of custodial interference were (1) taking, enticing or withholding a child and (2) depriving the legal custodian of custody of the child. *Price*, ¶ 19. We also concluded that the deprivation element had occurred in Missoula County, which was the site of the custody proceedings and the mother's residence. *Price*, ¶ 24.

8

¶29   The custodial interference statute in *Price* and the parenting interference violation charged here differ only in the status of the people involved. One refers to a legal custodian while the other applies to interference with a parent. The act of interference, however, continues to require a withholding and deprivation. Like the victim in *Price*, Haugum both resided and had instituted proceedings to establish custody in the county where the State filed the charge. Young refused service for these proceedings and avoided contact with Haugum. Young's affirmative actions did not take place in Missoula County. Similar to *Price*, however, the deprivation aspect of the offense occurred in Missoula County. We conclude that the District Court did not err when it denied Young's motion to dismiss for improper venue.

## ISSUE TWO

¶30   *Did the State prove the elements of parenting interference?*

¶31   Section 45-5-634(1)(b), MCA, addresses the deprivation of a person's parenting rights when that person has parenting authority under a court order. In contrast, § 45-5-634(1)(a), MCA, prohibits the deprivation of parenting rights "before the entry of a court order determining parenting rights . . . ." Despite this straightforward language, Young argues that § 45-5-634(1)(a), MCA, applies only to males who first have established paternity. She further contends that Haugum cannot satisfy even the presumption of paternity standard under § 40-6-105, MCA, of the Uniform Parentage Act (UPA), Title 40, Chapter 6, Part 1, MCA. The State argues that Haugum's testimony at trial sufficiently proved that he was a parent for purposes of the criminal interference statute.

9

¶32    We start with the UPA. Section 40-6-104, MCA, declares that the parent and child relationship between a child and the natural father "may be established" under the procedures set forth in the UPA. The UPA creates the "presumption of paternity" based upon certain sets of circumstances. Section 40-6-105, MCA. These circumstances, by no means, represent the sole method for establishing paternity pursuant to the UPA, as evidenced by the fact that the UPA elsewhere sets standards regarding the admissibility of evidence for such purposes.

¶33    Section 40-6-113, MCA, governs the evidence admissible for establishing paternity under the UPA. The quality of evidence required by the UPA varies greatly. The requirements range from statistically reliable blood tests to mere evidence of sexual intercourse between the mother and alleged father at the time of conception. Sections 40-6-113(1), (3), MCA. The UPA allows establishing paternity by "all other evidence relevant to the issue of paternity of the child." Section 40-6-113(5), MCA.

¶34    Haugum testified at trial that he was the child's father. Haugum testified regarding the fact that he and Young had engaged in sexual intercourse at the time of conception. Haugum stated that he and Young had made a deliberate decision to engage in sexual intercourse without using birth control. Haugum testified that conception occurred while he and Young lived together in Nevada.

¶35    Haugum also testified regarding other evidence relevant to the issue of paternity. For example, Haugum testified that he and Young had discussed having a baby early in the relationship. Haugum testified that Young informed Haugum she had a surprise for him and handed him a positive pregnancy test. Haugum testified that he accompanied Young to two

10

prenatal visits. Haugum testified that he and Young had witnessed a sonogram revealing a baby girl on one of those visits and that Young had given him the sonogram images. He also testified that Young stated "You're her father."

¶36 The parenting interference charge against Young expressly provided for interference with parenting rights before a court had entered an order determining those rights. Section 45-5-634(1)(a), MCA. We decline to require litigants to demonstrate their parental status under the Uniform Parentage Act in every instance involving a Montana statute that employs the term "parent." The State presented sufficient evidence to establish Haugum's paternity under the standards set forth in the UPA. Sections 40-6-113(1), (5), MCA. Thus, the State presented sufficient evidence to establish the fact that, during the period of Young's alleged acts of interference, Haugum qualified as a parent for the purposes of § 45-5-634(1)(a), MCA.

¶37 Young asserts that even if Haugum is the father, a male does not have parenting rights absent a judicial declaration of a father and child relationship under § 40-6-114(1), MCA. She also argues, alternatively, that she could not interfere with a parenting right because Haugum had not asserted such a right. She points out that Haugum's proposed parenting plan asked only for periods of visitation.

¶38 No Montana statute specifically defines parenting rights for purposes of § 45-5-634, MCA. Several other statutes concerning the obligations of parents, however, provide some insight. The parent of a child is required to "give the child support . . . ." Section 40-6-211, MCA. The father and mother of an unmarried minor child are entitled equally to the parenting of the child. Section 40-6-221, MCA. For purposes of child support, state

11

mandated obligations of parenthood do not exist without an administrative hearing and order. Section 40-5-235, MCA. The court may enter such an order, however, simply on the written consent of an alleged father. Section 40-5-232(3), MCA.

¶39    Young is correct in asserting that the State cannot impose parental obligations without affording a right to a hearing. This fact does not necessitate the conclusion, however, that a natural parent possesses no parenting rights absent a hearing. Haugum did not institute a paternity proceeding to establish his parenting rights and obligations. He instituted a paternity proceeding to secure those rights and to secure his ability to have a relationship with his daughter. Haugum inherently possessed parenting rights as a natural parent. *See Price*, ¶ 24. We conclude, for purposes of § 45-5-634(1)(a), MCA, that the same evidence supporting Haugum's paternity also established his parenting rights and sufficed to support the jury's verdict.

### ISSUE THREE

¶40    *Did the District Court err in failing to give the jury instructions proposed by Young?*

¶41    Young next argues that the District Court erred in failing to give the jury instructions on the elements of the offense and the issue of venue. Young failed to include in the record on appeal either her proposed instructions or the instructions actually given by the trial court. A party seeking review of a judgment must "present the supreme court with a record sufficient to enable it to rule upon the issues raised." M. R. App. P. 8(2). We cannot review this claim without having the instructions in the record. *Howard v. Fraser,* 83 Mont. 194,

12

199, 271 P. 444, 445-46 (1928); *Giambra v. Kelsey*, 2007 MT 158, ¶ 41, 338 Mont. 19, ¶ 41, 162 P.3d 134, ¶ 41.

## ISSUE FOUR

¶42 *Did the District Court impose an illegal sentence by including conditions regarding alcohol and casinos and by ordering a mental health evaluation?*

¶43 Young claims that the District Court imposed an illegal sentence when it ordered conditions regarding alcohol, casinos, and a mental health evaluation. Section 46-18-201(4)(o), MCA, allows a court to impose "any other reasonable restrictions or conditions considered necessary for rehabilitation or for the protection of the victim or society." A sentencing condition must have some correlation or connection to the underlying offense. *State v. Ommundson*, 1999 MT 16, ¶ 11, 293 Mont. 133, ¶ 11, 974 P.2d 620, ¶ 11.

¶44 The defendant in *Ommundson* pled guilty to driving under the influence (DUI). *Ommundson*, ¶ 1. The district court suspended his sentence on conditions that included his participation in a sex offender treatment program. *Ommundson*, ¶ 1. We concluded that no nexus existed between the condition of sexual offender treatment and the charged offense of DUI. *Ommundson*, ¶ 12.

¶45 Young points out that the offense charged does not involve either alcohol or gambling. The State concedes the lack of any evidence directly linking alcohol consumption to Young's crime. The State points only to a statement made by Haugum at the sentencing hearing alleging that Young often spent time in two bars in Bozeman rather than with her daughter. The parenting plan for Haugum and Young required Young to obtain a chemical dependency evaluation. The results of that evaluation indicated that she did not have a

13

substance abuse problem. The Pre-sentence Investigation (PSI) revealed only past involvement with drugs or alcohol. The report contained no reference to gambling.

¶46 Our holding in *Ommundson* allows only conditions correlating to Young's rehabilitation for purposes of this offense and for protecting others from future harm of this nature. Haugum's statement at the sentencing hearing regarding Young allegedly spending time in bars fails to provide a sufficient nexus between alcohol consumption or gambling and the probability that Young will repeat this offense. We conclude that the District Court erred in imposing the alcohol and casino restrictions. We remand to the District Court to strike the alcohol and casino restrictions from Young's sentence.

¶47 Young also objects to the mental health evaluation required by the District Court. She claims that the charged offense does not deal with mental issues and that the PSI does not suggest that Young suffers from a mental illness. The State counters that Young failed to obtain the psychological evaluation ordered as part of the civil parenting plan between her and Haugum. The State argues that the condition reasonably provides for the protection of Haugum and the child—the victims in the case.

¶48 We note that the State initiated the present case based upon Young's refusal to respond to service for the civil parenting proceeding. The civil parenting proceeding eventually took place and the court ordered a mental health evaluation. Young failed to comply with that court order. The PSI detailed Young's inability to take responsibility for her actions. The District Court described the present case as "the worst custody case I have ever come across." The District Court noted that Young's actions have placed two children in a great deal of turmoil.

14

¶49 The District Court opined that Young's actions and her inability to accept responsibility may have stemmed from mental health issues. The District Court highlighted the necessity for Young to "get through" the issues for her own sake and that of her children. The District Court determined that requiring an evaluation would improve the ability of the State to identify and address any mental health issues facing Young and thereby increase the probability of rehabilitating Young and protecting her children. Young's past actions and the conduct forming the basis for the underlying offense reveal a correlation between the evaluation ordered and her conviction for parenting interference. We conclude the District Court did not err when it ordered Young to complete a mental health evaluation.

## ISSUE FIVE

¶50 *Did the District Court improperly order restitution?*

¶51 Young contends that the District Court improperly ordered her to make restitution to Haugum and Burlage, the father of her first child. A sentencing court must require payment of full restitution to any victim of an offense who suffered a pecuniary loss. Section 46-18-201(5), MCA. We require district courts to follow the statutory guidelines for imposing restitution. *State v. Eixenberger*, 2004 MT 127, ¶ 22, 321 Mont. 298, ¶ 22, 90 P.3d 453, ¶ 22. The State concedes that the father of Young's first child was not a victim of this offense and that the District Court lacked the authority to impose restitution for his loss. The State and Young also agree that the District Court failed to follow the requisite procedures for imposing restitution for Haugum's loss. We agree. We remand this case to provide the

15

District Court the opportunity to determine and impose restitution in accordance with the statutory guidelines.

¶52     We affirm in part, reverse in part, and remand for further proceedings.

/S/ BRIAN MORRIS

We Concur:

/S/ KARLA M. GRAY
/S/ W. WILLIAM LEAPHART
/S/ JOHN WARNER
/S/ JIM RICE

Justice Patricia O. Cotter dissents.

¶53 I dissent from the Court's resolution of Issue 2. Because the State failed to prove that Young engaged in criminal conduct at the time she ostensibly withheld the child, I would reverse and remand Young's conviction.

¶54 My first concern with our decision is that the Court's reasoning is unsupported by the statutes upon which the Opinion is premised. The Court relies upon § 45-5-634(1)(a), MCA, the parenting interference statute, to support its decision, stating that it "prohibits the deprivation of parenting rights 'before the entry of a court order determining parenting rights . . . .' " Opinion, ¶ 31 (quoting § 45-5-634(1)(a), MCA). If the statute ended there, I might be inclined to agree with the majority on this issue. However, I would argue the plain language of the statute requires that there be a legally-recognized parental relationship established before the act allegedly giving rise to the crime of parenting interference can be considered criminal. That portion of the statute relevant to the current appeal reads in full as follows:

> (1) A person commits the offense of parenting interference if, knowing that the person has no legal right to do so, the person:
>
> (a) before the entry of a court order determining parenting rights, takes, entices, or withholds a child from *the other parent* when the action manifests a purpose to substantially deprive *that parent* of parenting rights;
>
> . . . .

Section 45-5-634(1)(a), MCA (emphasis added).

¶55 As I see it, the statute presumes the status of the two parties *as parents* as a "given." The statute would apply in those cases where parents preparing to divorce are fighting over custody or visitation, and one parent takes off with the kids before any court order fixing

17

custody or visitation can be entered—a not uncommon occurrence. The point is that in such situations, there is no question, as there is here, about parentage. While I concede that there are no cases in which this statute has been interpreted, it simply makes no legal sense to apply the statute so as to criminalize behavior in a situation where parentage has not even been established.

¶56 The Uniform Parentage Act, §§ 40-6-101 through 123, MCA, sets forth the manner in which a parent-child relationship may be established. Notably, § 40-6-102(2), MCA, states: " 'Parent and child relationship' means the *legal relationship* existing between a child and the child's natural or adoptive parents incident to which the law confers or imposes rights, privileges, duties and obligations." (Emphasis added). Section 40-6-105, MCA, then sets forth those circumstances under which a presumption of paternity arises—e.g., via marriage of the parents or the joint execution of a paternity acknowledgement form provided by DPHHS. The parties here did nothing prior to the charges being filed against Young to bring a presumption of paternity into being. It follows, therefore, that the "legal relationship" of paternity had yet to be established in any fashion when Young was charged with her crime; thus, the law had not yet conferred or imposed any "rights, privileges, duties [or] obligations" upon Haugum, or upon Young vis a vis Haugum. Quite simply, Young was not interfering with any legal relationship when she withheld her child from Haugum.

¶57 I do not agree with the Court's conclusion that the State presented sufficient evidence to establish Haugum's paternity under the standards set forth in the UPA. Opinion, ¶ 36. But assuming for the sake of argument that I did, my fundamental quarrel with the manner in which this case was charged and tried remains. The legal relationship necessary to support

18

the crime was not established at the time Young ostensibly withheld the child; in fact, it was not proven until the middle of Young's felony trial. What we have done here, however, is announce that a determination of parentage made months after the ostensibly wrongful conduct occurred may be used to retroactively criminalize conduct that was lawful at the time committed.

¶58 While no new law has criminalized Young's conduct after the fact, our *ex post facto* jurisprudence is nonetheless instructive here. We have said that a law is *ex post facto*—and thus prohibited under the Constitution—if it punishes as a crime an act which was not unlawful when it was committed. *State v. Mount*, 2003 MT 275, ¶ 24, 317 Mont. 481, ¶ 24, 78 P.3d 829, ¶ 24. The same rationale ought to apply here.

¶59 Thus, the crux of the problem with this case is that the District Court both decreed paternity *and* convicted Young of interfering with it, all in one action. This is akin to a court resolving a dispute over property ownership and then, in the same action, convicting the non-prevailing party of theft. Simply put, due process would seem to demand that the key element of the crime—i.e., Haugum's paternity—must have been fixed *before* Young's conduct in ostensibly interfering with it could be considered criminal.

¶60 In sum, I submit that where an unwed mother is not prepared to stipulate to paternity, there must be a prior determination of paternity *before* her conduct of withholding the child can be considered criminal. I would conclude that because Haugum's parentage had not been established prior to the charges being brought against Young, Haugum had no established "legal" paternity rights with which Young could have interfered. I would therefore reverse Young's conviction.

/S/ PATRICIA COTTER


Justice James C. Nelson joins in the dissenting Opinion of Justice Patricia O. Cotter.

/S/ JAMES C. NELSON